**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

SHIRLEY GLENN and WILLIAM
GLENN, wife and husband,

        Plaintiffs,

vs.

B & R PLASTICS, INC., a Colorado
corporation; and JOHN DOES I – X,

        Defendants.

No. 1:16-CV-00508-MWB

OPINION AND ORDER
REGARDING PLAINTIFFS'
MOTION TO AMEND COMPLAINT,
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, AND
DEFENDANT'S MOTION TO
EXCLUDE EXPERT TESTIMONY

---

## TABLE OF CONTENTS

I.    **INTRODUCTION**..................................................................3
    A.    *Factual Background* ....................................................3
        1.    *The parties*.......................................................3
        2.    *The accident*.....................................................4
        3.    *The liability experts' opinions*............................5
    B.    *Procedural Background* ................................................8
        1.    *The Complaint and the Answer*...........................8
        2.    *The pending motions* ......................................9

II.    **LEGAL ANALYSIS** .......................................................10
    A.    *B&R's* **Daubert** *Motion* ..............................................10
        1.    *Arguments of the parties*.................................11
        2.    *Applicable standards*.....................................13
        3.    *Application of the standards* ...........................17
    B.    *Summary Judgment* .................................................20
        1.    *Scope of the motion*......................................20
            a.    *Arguments of the parties* ......................21
            b.    *Discussion* ........................................21
        2.    *Summary judgment standards* ........................26

3.     *The breach of warranty claims* ......................................... 28
4.     *Failure to establish* **prima facie** *claims of products liability*............................................................................... 30
        a.     *The elements in dispute* ......................................... 30
        b.     *Abnormal use* ......................................................... 31
               i.     *Arguments of the parties* ............................... 31
               ii.    *Discussion* ...................................................... 33
        c.     *Reasonable secondary causes* ................................. 34
               i.     *Arguments of the parties* ............................... 34
               ii.    *Discussion* ...................................................... 36
5.     *Insufficient evidence* ................................................... 39
        a.     *Arguments of the parties* ...................................... 40
        b.     *Discussion* ............................................................. 41
C.     *Punitive Damages* ................................................................ 48
III.     *CONCLUSION* ............................................................................ 48

This case arises from an elderly woman's fall while using an allegedly defective plastic stepstool to reach an item on a shelf in an upper cabinet in her kitchen. The injured woman seeks damages for her injuries from the manufacturer of the stepstool on theories of products liability and breach of warranties, and her husband seeks damages for loss of consortium. The plaintiffs now seek leave to amend their complaint to assert a claim for punitive damages, while the defendant seeks summary judgment on the plaintiffs' claims and exclusion of the testimony of the plaintiffs' liability expert.

## I.    INTRODUCTION

### A.    *Factual Background*

This statement of the factual background does not necessarily set out all the parties' factual allegations in support of and resistance to the pending motions. Rather, it focuses on the key facts to put in context the parties' arguments on those motions. Unless otherwise indicated, the following facts are undisputed.

### 1.    *The parties*

The plaintiffs in this action are Idaho citizens Shirley Glenn and her husband, William Glenn. Defendant B&R Plastics is a Colorado corporation not licensed to do business in Idaho. B&R manufactures, inspects, and markets certain plastic housewares, including the 9-inch "E-Z Foldz Folding Step Stool" (stepstool) at issue in this case.

Mrs. Glenn is 76 years old, 5 feet 2 inches tall, and weighed about 100 lbs. at the time of her accident on December 3, 2014. She contends that, prior to the accident, she was in good health and was able to walk up to two miles per day. In contrast, B&R contends that Mrs. Glenn had a "complex" prior medical history, including arthritis in her right knee and lower back, asthma, osteoporosis, and injuries from a motorcycle accident in 2009. B&R argues that Dr. Ronald Kristensen, an orthopedic surgeon, who performed an "independent" medical examination of Mrs. Glenn and studied her records, opines that Mrs. Glenn's medical history shows that she was "at high risk" for a dizzy or syncopal (fainting) episode at the time of the accident, because of recent diarrhea, which can cause dehydration, hypotension, and dizziness; because she was also taking several medications known to cause dizziness and/or low blood pressure; and because of what Dr. Kristensen opines is "a history of seizure disorder."

Mrs. Glenn does not recall ever being diagnosed with epilepsy or a seizure disorder and denies experiencing any "dizziness, lightheadedness, vertigo or any other concerning signs or symptoms" when being treated at St. Luke's Hospital on the day of

the accident. She asserts that the last time she fell was approximately fifteen years ago. She also contends that her treating physician and non-retained expert, Dr. Michael T. Daines, also an orthopedic surgeon, can corroborate that her medical records from December 3, 2014, lack any indication that dizziness caused her fall. She also points out that Dr. Daines believes that an internal medicine specialist can comment more properly on the potential impact of her general medical history than an orthopedic surgeon, such as Dr. Kristensen.

### 2. *The accident*

The parties apparently agree that Mrs. Glenn bought the folding stepstool, made by B&R, on which she was standing just before her accident, for $9.99 from Walmart in 2005. She used the stepstool in her home kitchen once or twice a week, opening it each time, then closing it, and storing it in the pantry behind the door. She had never previously had problems or incidents with the stepstool and it had never malfunctioned, been damaged, slipped, or broken. When purchased, the stepstool had two or three warning decals, which Mrs. Glenn testified she read and heeded. Raised plastic letters at each end of the stepstool, still readable, state, "Always lock before use." Mrs. Glenn stated that her usual procedure was to take out the stepstool, set it down, make sure the sides were locked out, then "[t]ake it, the top, push it down, make sure it's locked good." At the time of the accident, two of the four guide- and locking-tabs on the stepstool were broken, and all four of the vinyl adhesive "feet" were missing. However, prior to the accident, Mrs. Glenn did not know of these problems with the stepstool or how they occurred. Mrs. Glenn stated that she only used the stepstool on smooth hard surfaces.

On December 3, 2014, about 1:00 or 1:30 p.m., Mrs. Glenn attempted to get a 5- or 6-pound ceramic bowl from a shelf in her kitchen cabinet about 7 feet above the floor. She got out the stepstool, placed it on the hickory hardwood floor about 6 inches from the base of the counter under the cabinet, opened the stepstool, and made sure its sides

were locked. She testified that she stood on the stepstool, flat-footed, evenly distributing her weight and not shifting it, and without leaning against the counter. As she reached up and touched the bowl, however, she suddenly found herself on the floor. She had not heard any noises before her fall or noticed any indications of instability of the stepstool. The stepstool was broken in pieces, and the parties now agree that Mrs. Glenn fell on it, breaking it, rather than the stepstool breaking first and causing Mrs. Glenn to fall, but Mrs. Glenn did not know that at the time of the accident.

### 3.     *The liability experts' opinions*

The Glenns' liability expert, Dr. Robert Stephens, is a mechanical engineer and professor of mechanical engineering, who specializes in fatigue and fracture of metals. As mentioned, above, B&R seeks exclusion of Dr. Stephens's testimony.

Dr. Stephens was retained to identify the mechanism of failure and to evaluate the stepstool from a mechanics and materials standpoint. He has never designed stepstools, and this is his first case involving a 9-inch plastic stepstool. He did not interview the Glenns prior to rendering his opinions, but relied on their depositions, instead. He also did not review Mrs. Glenn's medical records, interview her treating physician, Dr. Daines, read any witness interviews, inspect the scene of the accident, or learn the height of the cabinet or counter near which the accident occurred. Dr. Stephens did not do a direct accident reconstruction or use computer software for accident reconstruction. He did, however, inspect the stepstool in July 2015.

B&R points out that Dr. Stephens first did what B&R calls undocumented "extreme standing" tests with an exemplar stepstool. Dr. Stephens admits that these initial undocumented tests were unscientific and characterized them as "playing around," but he said in his deposition that he did not want to call them "extreme." He did not photograph these initial tests, measure forces, or document them in any way, and B&R points out that he admitted that he intentionally did not do so to avoid cross-examination

on this sort of accident reconstruction process. Dr. Stephens explained that these undocumented tests involved stepping on one edge of the stepstool, then another, and purposely trying to kick out the stepstool from under him. Dr. Stephens is 5 feet 9 inches tall and weighs 170 lbs., so that he is both taller and heavier than Mrs. Glenn was at the time of the accident. Dr. Stephens did these undocumented tests some thirty or forty times on the vinyl floor in his kitchen, not on a hickory hardwood floor like the one in the Glenns' kitchen. The undocumented tests dealt primarily with tipping, not sliding, and tipping turned on where Dr. Stephens positioned his feet on the stepstool and the location of the lateral force, specifically, whether he was pushing on the wall, on the counter, or on the cabinet. Dr. Stephens explained that he succeeded in kicking the stepstool out from under him, but the distance it traveled varied with the way in which and the location where he applied forces. He did not collect data on the direction of the stepstool's travel, where it came to rest, or the amount of force he had applied in each repetition. Dr. Stephens contends that he did not rely on these undocumented tests in reaching his opinions, but B&R disputes that.

Dr. Stephens did a documented coefficient of friction test, which showed that some 17 to 19 pounds of horizontal/lateral force would be required to cause the stepstool to slide sideways while vertically loaded with 119 lbs. The Glenns clarify that Dr. Stephens also concluded that 15 lbs. of horizontal/lateral force would be required to shift, tip, or slide the stepstool with a 100 lb. load, which is what Mrs. Glenn weighed at the time of her accident. Dr. Stephens hypothesizes that, to create that lateral force, Mrs. Glenn was pushing on the counter and/or pushing on the cabinet. He adds that reaching up and forward necessarily changed Mrs. Glenn's center of gravity, so that lateral forces, not just vertical ones, were at play. He also performed three videotaped tests that show the stepstool sliding, tipping, and buckling, although those videotaped tests did not involve

any recording of forces. The Glenns assert, however, that Dr. Stephens explained how to duplicate those tests in his Rebuttal Report.

From Dr. Stephens's 30 years of mechanical engineering experience, his observations of the subject stepstool and exemplar stepstools, and the tests he performed and documented, he opines, to a reasonable degree of engineering certainty, that "Mrs. Glenn fell because the folding step stool was defective in design." Dr. Stephens opines that the stepstool had a design defect that focuses on (a) the width and height of the plastic tabs underneath the top of the stepstool, which guide the opening maneuver, and (b) the "feet" material attached to the bottom of each of the four legs. One of Dr. Stephens's proposed alternative designs is the one that B&R actually used in and after 2010, which has strengthened tabs and different material for the "feet." Dr. Stephens does not criticize the polypropylene material from which the stepstool was made and does not opine that there is a manufacturing defect.

B&R's expert is Dr. Jericho Moll, a specialist in polymer science and materials chemistry. She conducted tests with 10 exemplar stepstools and modified them to match the stepstool at issue. Through an independent, third-party laboratory, she tested the stepstools with a load of 300 lbs. for five minutes on a level hickory floor. Five stepstools had side panels in the proper fully-locked position, and five were only partially extended, but all passed the test. Dr. Moll agrees with Dr. Stephens that the "feet" had been missing from Mrs. Glenn's stepstool a fair amount of time, but neither expert knows how or when they came off, and whether they came off separately or all at the same time. Dr. Moll opines that the broken tabs and missing feet constituted a "damaged state," and the stepstool should not have been used, but she also opines that the missing tabs and feet do not compromise the stated load capacity of the stepstool (300 lbs.) in a manner that would have caused it to break apart or collapse under Mrs. Glenn's weight of approximately 100 lbs.

Additional factual allegations may be relevant, in the analysis of other specific issues or if I reach the question of whether or not the Glenns should be allowed to amend their Complaint to seek punitive damages. For now, however, I turn to the procedural background of the case.

### B.     Procedural Background

#### 1.     The Complaint and the Answer

The Glenns filed their Complaint against B&R on November 23, 2016, seeking damages on seven causes of action. Their causes of action are the following: (1) "negligence," alleging that "B&R negligently failed to remove/recall the defective Original Step Stool from Defendants' distributors" and that "B&R negligently designed, tested, manufactured, inspected, marketed, distributed, and/or promoted the Original Step Stool and its component parts, and failed to exercise reasonable care in designing, testing, manufacturing, inspecting, marketing, distributing, and/or promoting the Original Step Stool and its component part," Complaint, ¶¶ 16-17; (2) breach of "express warranty," premised on B&R's alleged breach of a warranty that "the Original Step Stool was 'sturdy' and 'stable,' that it had a '300 lbs. capacity,' that it was meant to be used for reaching items on high shelves in kitchens, that it was fit for the ordinary purposes for which it was marketed, sold, and/or distributed, that it was reasonably safe, that it was merchantable quality, and that it was reasonably fit for the purpose of being stood upon to elevate its user," Complaint at ¶ 23; *see also id.* at ¶ 26; (3) breach of "implied warranty," premised on B&R's alleged breach of warranty that "the Original Step Stool was fit for the ordinary purposes for which it was sold, was reasonably safe, was of merchantable quality, and reasonably fit for the purpose of being stood on to elevate its user," Complaint at ¶ 32; *see also id.* at ¶ 35; (4) "strict liability," premised on B&R's alleged designing, testing, manufacturing, inspecting, marketing, distributing, and/or

promoting the Original Step Stool, which was "defective and unreasonably dangerous for reasons including, but not limited to, (a) the sidewall tabs, hinges, and ramps of the Original Step Stool as manufactured were not safe for use; (b) the sidewall tabs, hinges, and ramps of the Original Step Stool as manufactured deviated from reasonable design, manufacture and/or performance standards in that they did not provide the stability and support needed by Plaintiff Shirley Glenn; and (c) Defendants failed to warn and/or gave inadequate warnings regarding the hazards of using the product," Complaint at ¶ 38; (5) "joint and several liability" of B&R and "Defendant Doe," "in accordance with Idaho Code § 6-803(5)," Complaint, ¶¶ 42-44; (6) "willful and reckless" conduct by B&R, Complaint at ¶¶ 45-49; and (7) "loss of consortium," Complaint at ¶¶ 50-51. B&R filed its Answer on February 14, 2017, denying the Glenns' claims and asserting various defenses. On November 17, 2017, B&R filed an Amended Answer asserting two additional statutory defenses.

### 2. *The pending motions*

On April 26, 2018, the Glenns filed the first motion now before me, their Motion For Leave To Amend Complaint To Include A Claim For Punitive Damages, pursuant to IDAHO CODE § 6-1604. B&R filed its Opposition to that motion on May 17, 2018, and the Glenns filed their Reply on May 31, 2018. On May 21, 2018, B&R filed the second motion now before me, its Motion For Summary Judgment. The Glenns filed their Opposition on June 11, 2018, and B&R filed its Reply on June 22, 2018, along with additional evidence and objections to some of the Glenns' evidence. On May 25, 2018, B&R filed the third and last motion now before me, its *Daubert* Motion In Limine To Exclude Engineer Stephens. The Glenns filed their Opposition on June 15, 2018, and B&R filed its Reply on June 29, 2018.

By Order filed June 1, 2018, I set telephonic oral arguments on these three motions for June 26, 2018. At the oral arguments on June 26, 2018, however, B&R requested

that I delay oral arguments on its *Daubert* Motion until after it had filed its Reply concerning that Motion.  Therefore, I heard oral arguments on June 26, 2018, only on the Glenns' Motion To Amend and B&R's Motion For Summary Judgment.  I heard separate telephonic oral arguments on B&R's *Daubert* Motion on July 2, 2018.

All three motions are now fully submitted.

Throughout this litigation counsel on both sides have been a pleasure to work with. They have been extremely well prepared, consummate professionals, always demonstrating extraordinary civility with each other and me.  They are a model of how lawyers should work to together while still being zealous advocates for their clients. Their depositions are also a model of efficiency with zero obstructive objections or conduct and nothing but super courteous conduct towards the deponents and each other.

## II.    LEGAL ANALYSIS

I will consider, first, the last motion filed, B&R's Daubert Motion In Limine To Exclude Engineer Stephens, because it is determinative of whether I can consider the challenged expert's opinions in ruling on the Motion For Summary Judgment.  I will then consider B&R's Motion For Summary Judgment, because it will not be necessary to consider the Glenns' Motion For Leave To Amend Complaint To Include A Claim For Punitive Damages if the Glenns' claims do not survive summary judgment.  *See, e.g., Cedillo v. Farmers Ins. Co.*, 163 Idaho 131, ___, 408 P.3d 886, 892 (2017).

### A.    B&R's Daubert Motion

B&R seeks exclusion of Dr. Stephens's testimony pursuant to Rules 402, 403, and 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny.  The Glenns resist.

### *1.    Arguments of the parties*

B&R argues that Dr. Stephens's testimony is not reliable, because, in forming his opinions, Dr. Stephens conducted "extreme standing" tests, but collected no data and made no documentation of those tests, did not replicate them, and admits that they were not consistent with the facts of this case.  Therefore, B&R contends that Dr. Stephens's theory underlying the undocumented tests has not been properly tested, cannot be recreated, and is not reliable—and his assertion that he did not rely on those undocumented tests shows that even he does not consider them sufficiently reliable to be the basis for an expert opinion.  B&R contends that the undocumented tests also fail to meet relevant and accepted scientific standards.   Furthermore, B&R argues, the undocumented tests are based on impermissible speculation and conjecture about the circumstances in which the accident occurred.  In short, B&R argues that Dr. Stephens's report is nothing more than a conclusory recitation of the Glenns' various ad hoc and competing theories, dressed up in the authority of an expert.

Next, B&R contends that Dr. Stephens's testimony is not relevant, because it is unduly speculative and unsubstantiated by facts in the record, so it will not assist the trier of fact to understand the evidence or determine a fact at issue.  B&R acknowledges that Dr. Stephens conducted a coefficient of friction test, to determine the amount of lateral force required to slide the stepstool, but only after it was clear that the stepstool did not "collapse," as the Glenns originally alleged.  B&R argues that Dr. Stephens's opinions on sliding and tipping, however, are also not relevant, because they are built entirely on possibilities and conjectures about what happened contrary to Mrs. Glenn's testimony concerning her lack of contact with a counter or cabinet.  Thus, B&R labels this theory mere *ipse dixit*.

Finally, B&R contends that Dr. Stephens's testimony is prejudicial, misleading, and confusing.  It is prejudicial, B&R argues, because of the tendency jurors have to give

undue weight to expert testimony. B&R argues that Dr. Stephens's testimony is also misleading and confusing, because it is based on facts not in, and sometimes contrary to, the record, or based on no evidence at all.

In opposition, the Glenns assert that Dr. Stephens is well-qualified to render an expert opinion, an issue that B&R did not dispute. The Glenns also argue that Dr. Stephens's methodology and opinions are proper, because he drew on his education, training, and 30 years of experience in the field of mechanical engineering, as well as his experience and expertise in biometrics and applying materials to design a product capable of fulfilling its purpose. The Glenns assert that, contrary to B&R's contention, Dr. Stephens incorporated and relied on multiple studies when formulating his opinions, including a coefficient of friction test and a stability study in which he stepped on and pushed down on the stepstools to see deflections, after modifying exemplar stepstools to match the condition of Mrs. Glenn's stepstool. The Glenns also point out that Dr. Stephens inspected the subject stepstool as part of his analysis. They argue that Dr. Stephens also relied on depositions of the Glenns and others, as well as B&R's records of consumer complaints, lawsuits, and design modifications.

As to the undocumented standing tests, the Glenns argue that Dr. Stephens merely "qualitatively alluded" to them, but adequately explained that he did not document them, because they were outside the bounds of what he needed to show to provide his opinions on a design defect, and he expressly stated that he did not rely on them in formulating his opinions. The Glenns argue that what Dr. Stephens describes from his documented testing is consistent with what is shown in his videotapes of those tests and that he concluded that a re-enactment or a reconstruction was unnecessary to, and would not have changed, his opinions. They also argue that Dr. Stephens used "collapse" as a generic term for failure of the stepstool, not as specifically indicating that the stepstool broke apart causing the accident.

The Glenns argue that, because Dr. Stephens's theory that the stepstool shifted, tipped, or slid, causing Mrs. Glenn to fall, is supported by the facts of the case, it is relevant. They argue that, as Dr. Stephens explained, Mrs. Glenn's testimony reflects that she was reaching up and forward when she touched the cupboard, which would have caused her center of gravity to shift and would have applied horizontal or lateral forces to the stepstool; thus, his theories and opinions are not so speculative as to be irrelevant and inadmissible. In particular, the Glenns argue that Dr. Stephens's expert testimony is relevant, because it identifies the design defects associated with the stepstool and explains how those design defects more likely than not contributed to Mrs. Glenn's fall. Finally, they argue that Dr. Stephens's testimony is not more prejudicial than probative, where they have shown its relevance and the sufficiency of its foundation.

In reply, B&R reiterates that Dr. Stephens's opinions fail all of the relevant factors for admission of expert testimony, because he failed to provide scientific or measurable data, quantification, or analysis, to support his "could have" theories of "shifting," "tipping," or "sliding." B&R argues that Dr. Stephens's examination of the stool yielded no reliable opinions; his videotaped "tests" are unmeasured, unquantified, and unhelpful to the trier of fact; and his "extreme standing" tests are admittedly unscientific. Even Dr. Stephens's coefficient of friction tests, B&R argues, are irrelevant, because they do not identify the source of any lateral force, just more speculation that Mrs. Glenn could have applied such lateral force, and his "center of gravity" theories are not based on any baseline center of gravity. In short, B&R argues that Dr. Stephens has just presented theories based on speculation about what could have happened, not reliable expert opinions about what did happen.

### 2. *Applicable standards*

The Ninth Circuit Court of Appeals "review[s] the district court's admission of expert testimony for abuse of discretion." *United States v. Johnson*, 875 F.3d 1265,

1280 (9th Cir. 2017). The starting point in the analysis of the admissibility of expert testimony is the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), which "effected a sea change in the way that courts consider admission of expert testimony." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). As the Ninth Circuit Court of Appeals explained,

> Before *Daubert*, courts generally followed the "general acceptance" test, which focused on recognition in the relevant field. 509 U.S. at 585–86, 113 S.Ct. 2786. The Court in *Daubert* rejected that test as too rigid; drawing on Federal Rule of Evidence 702, the Court constructed a flexible test examining the "reliability" and "fit" of the offered expert testimony. *See id.* at 589–92, 113 S.Ct. 2786.

*Murray*, 870 F.3d at 922. Thus, "[p]ursuant to the Federal Rules of Evidence [and *Daubert*], the district court judge must ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 589), *cert. denied sub nom. Teva Pharm. USA, Inc. v. Wendell*, 138 S. Ct. 1283 (2018). Indeed, a district court abuses its discretion when it admits an expert's testimony without making the requisite relevance and reliability findings. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc).

The goal of the "reliability" inquiry under Rule 702 of the Federal Rules of Evidence and *Daubert* is for district courts to "play an active and important role as gatekeepers examining the full picture of the experts' methodology and preventing shoddy expert testimony and junk science from reaching the jury." *Murray*, 870 F.3d at 923 (citing *Daubert*, 509 U.S. at 595–97). The district court cannot simply abdicate that gatekeeper responsibility or render an opinion without analysis or explanation. *Id.* at 925; *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1069 (9th Cir. 2017).

More specifically, the "reliability" inquiry "asks whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *United States v. Wells*, 879 F.3d 900, 933–34 (9th Cir. 2018) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999), with alteration omitted).

> Scientific evidence is reliable "if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. As we explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the court's "task … is to analyze not what the experts say, but what basis they have for saying it." 43 F.3d 1311, 1316 (9th Cir. 1995) (hereinafter *Daubert II*).

*Wendell*, 858 F.3d at 1232.

The Supreme Court has identified several factors that may be relevant to the reliability inquiry:

> These factors are: (1) whether the method has been tested; (2) whether the method "has been subjected to peer review and publication;" (3) "the known or potential rate of error;" (4) whether there are "standards controlling the technique's operation;" and (5) the general acceptance of the method within the relevant community.

*United States v. Johnson*, 875 F.3d 1265, 1280 n.10 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 592-95); *Murray*, 870 F.3d at 922 (listing the same factors); *Wendell*, 858 F.3d at 1232 (identifying the "non-exclusive" factors as also including whether the experts are testifying about matters growing naturally out of their own independent research, or if they have developed their opinions expressly for purposes of testifying). Nevertheless, "[a]pplicability [of these factors] depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Murray*, 870 F.3d at

922 (quoting *Kumho Tire Co.*, 526 U.S. at 150). Thus, the Ninth Circuit Court of Appeals and Supreme Court have stressed that "whether these specific factors are 'reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.'" *Estate of Barabin*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Kumho Tire Co.*, 526 U.S. at 150); *accord Wells*, 879 F.3d at 934 (recognizing that the inquiry is "a flexible one," and the district court has "broad latitude" in determining its form); *Murray*, 870 F.3d at 923 (also recognizing that the court has "broad latitude" to decide how to test reliability).

Just as expert testimony should not be admitted if it is unreliable, expert testimony should not be admitted if it is not relevant. *Wendell*, 858 F.3d at 1232. The Ninth Circuit Court of Appeals has defined "relevant" evidence as evidence that "logically advance[s] a material aspect of [a] party's case." *Estate of Barabin*, 740 F.3d at 463 (citation omitted). This is a "low" bar. *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citing *Daubert II*, 43 F.3d at 1315).

Reliability and relevance must be distinguished from problems with expert opinions that amount to impeachment and, consequently, do not warrant exclusion. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (stating that, under *Daubert*, "[t]he judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" (quoting *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013))). Thus, "[a]s *Daubert* confirmed, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Wells*, 879 F.3d at 933 (quoting *Daubert*, 509 U.S. at 596).

On the other hand, evidence that meets *Daubert's* reliability and relevance requirements may still be excluded on Rule 403 grounds. *See Estate of Barabin*, 740

F.3d at 466 (finding "no precedent" for treating the erroneous admission of prejudicial expert testimony any differently from any other evidence). That said, "'[a]s long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect of proffered [expert] evidence before its admission, [the Ninth Circuit Court of Appeals will] conclude that the demands of Rule 403 have been met.'" *Wells*, 879 F.3d at 924 (quoting *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir. 1978)).

### 3. *Application of the standards*

B&R challenges the admissibility of Dr. Stephens's undocumented testing—which Dr. Stephens himself called "playing around"—on both "reliability" and "relevance" grounds. I conclude that such evidence meets neither of these requirements of *Daubert* and the Federal Rules of Evidence. *See Murray*, 870 F.3d at 922; *Wendell*, 858 F.3d at 1232. Such evidence lacks "'a reliable basis in the knowledge and experience of the relevant discipline,'" *Wells*, 879 F.3d at 833-34, and the Glenns do not argue that any principles or methodology that Dr. Stephens used in those undocumented tests are "grounded in the methods of science." *Wendell*, 858 F.3d at 1232. Such undocumented testing fails to satisfy any of the non-exclusive factors expressly listed in *Daubert*, *see Johnson*, 875 F.3d at 1280 n.10; *Murray*, 870 F.3d at 922, nor do the Glenns argue that such testing satisfies other factors pertinent in this case. *Estate of Barabin*, 740 F.3d at 463. No party in this case pretends that the undocumented testing was anything other than "junk science" that will not be, and was never intended to be, offered to the jury. *Murray*, 870 F.3d at 923. Moreover, the Glenns do not argue that this "testing" is relevant, even under the applicable "low" bar that it "logically advance[s] a material aspect of [their] case." *Estate of Barabin*, 740 F.3d at 463; *Messick*, 747 F.3d at 1196. Thus, evidence of Dr. Stephens's undocumented testing will be excluded, except for purposes of impeachment, if he is allowed to testify as to any opinions.

Turning to Dr. Stephens's videotaped "standing" or "deflection" tests, those tests do nothing more than show that the stool can be tipped over or pushed and that it deflects when a person places one foot on it. As B&R points out, however, there is absolutely no indication of any measurement of any forces used in the videotaped tests. Thus, these tests fail to satisfy any of the factors identified as pertinent to the *Daubert* inquiry: there is no indication of testing of the method; no indication of peer review of the method; no attempt to determine an error rate; no indication of any control standards; and no general acceptance of the method within the relevant community. *See, e.g., Daubert*, 509 U.S. at 592-95); *Murray*, 870 F.3d at 922; *Wendell*, 858 F.3d at 1232. To put it another way, while these tests may be demonstrative of scientific "principles," they lack any scientifically reliable methodology that warrants admissibility. *Daubert*, 509 U.S. at 595; *Wendell*, 858 F.3d at 1232. Indeed, because the videotaped "tests" amount to nothing more than demonstrations of the unsurprising basic principles that the stool can be tipped or slid or deflects when weight is placed upon it, they have slight, if any, likelihood of logically advancing any material aspect of the Glenns' case, *Estate of Barabin*, 740 F.3d at 463 (citation omitted), even recognizing the "low" bar that is applicable to relevance of expert testimony. *Messick*, 747 F.3d at 1196. Opinions based on these tests will also be excluded.

That leaves Dr. Stephens's tests to determine the coefficient of friction and his opinions about the effect of a shifting center of gravity or other circumstances applying the necessary lateral force to slide or tip the stool, in light of the coefficient of friction he has derived. Dr. Stephens does not attempt any testing to determine, from a baseline, how Mrs. Glenn's center of gravity might have shifted in the circumstances of this case, or when and how such a shift would have affected shifting or sliding of the stepstool. Thus, once again, he has identified only scientific "principles," but he has not applied any scientific "methodology" to demonstrate how those principles apply in or relate to

this case. *Daubert*, 509 U.S. at 595; *Wendell*, 858 F.3d at 1232. The Glenns' argument that the documented tests and resulting conclusions about sliding, shifting, tipping, and buckling grow naturally out of Dr. Stephens's education, training, and 30 years of experience in the fields of mechanical engineering, biometrics, and applying materials to product designs is not enough, in this case, in light of all the other missing factors of reliability. *Cf. Wells*, 879 F.3d at 833-34 (considering whether an expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline); *Wendell*, 858 F.3d at (identifying a relevant factor as whether the expert is testifying about matters growing naturally out of his or her own independent research).

Indeed, the application of the "principles" cited by Dr. Stephens to this case relies on little more than *ipse dixit*. Dr. Stephens resorts to speculation, in his reports, declarations, deposition testimony, about how various forces or circumstances "could have" existed and "could have" resulted in the accident. For example, as B&R contends, Dr. Stephens's opinions that Mrs. Glenn stood at the edge of the stool and inadvertently applied lateral force by pushing against the counter or cupboard is contrary to Mrs. Glenn's own testimony that she was standing flat-footed on the stepstool, evenly distributing her weight and not shifting it, and without leaning against the counter. I note that there is or may be a "hole" in the sequence of events in Mrs. Glenn's testimony about what happened between when she stood on the stool and reached up for the bowl and the point at which she found herself on the floor. Even so, Dr. Stephens's opinions about what happened in that "hole" in the sequence of events are simply speculation bound loosely, if at all, to any scientific principles or reliable methodology.

These flaws in Dr. Stephens's methodology are not simply matters of impeachment, which would not warrant exclusion of his testimony. *See City of Pomona*, 750 F.3d at 1044. Nor are they matters that should simply be addressed by "vigorous cross-examination," "presentation of contrary evidence," and proper instructions, which

are the traditional methods to challenge "shaky" evidence. *See Wells*, 879 F.3d at 933 (quoting *Daubert*, 509 F.3d at 596). Rather, they are fundamental flaws in Dr. Stephens's opinions that show that those opinions are not "grounded in the methods of science." *Wendell*, 858 F.3d at 1232.

Furthermore, even were I convinced that I could allow Dr. Stephens's opinions to pass while playing my active role as a "gatekeeper" to "prevent[] shoddy expert testimony and junk science from reaching the jury," *Murray*, 870 F.3d at 923 (citing *Daubert*, 509 U.S. at 595–97), I would exclude them on Rule 403 grounds. *See Estate of Barabin*, 740 F.3d at 466 (finding "no precedent" for treating the erroneous admission of prejudicial expert testimony any differently from any other evidence). The "disconnect" between scientific principles and any methodology demonstrating the application of those principles to the facts of this case renders Dr. Stephens's opinions potentially misleading, confusing, and time wasting, as well as providing jurors with an improper basis for decision-making by abdicating their fact-finding to testimony with the imprimatur of expertise. FED. R. EVID. 403.

Therefore, B&R's *Daubert* Motion In Limine To Exclude Engineer Stephens is **granted**, and Dr. Stephens's testimony will be excluded in its entirety.

## B. Summary Judgment

The next motion I will consider is B&R's May 21, 2018, Motion For Summary Judgment. The Glenns resist this motion.

### 1. Scope of the motion

The first issue I must resolve is the scope of the Motion For Summary Judgment. This is so, the Glenns argue that, even if B&R's Motion For Summary Judgment is granted, it does not address all their claims.

### a.    *Arguments of the parties*

B&R plainly believes that the alleged flaws it has identified in the Glenns' case preclude all their claims, because it "moves for summary judgment on each and every claim in the Complaint." Certainly, the claims for loss of consortium and other relief are derivative of the products liability and warranty claims, so that summary judgment on the derivative claims follows if it is appropriate on the principal claims. Similarly, in their Memorandum In Opposition, the Glenns describe their case as "a products liability case alleging design defect(s)." On the other hand, the Glenns argue that they have also asserted failure to warn and failure to properly test and inspect, as well as design defect claims and breach of warranty claims. They argue that B&R's Motion For Summary Judgment attacks only their design defect and breach of warranty allegations, but does not directly address their failure to warn claim or their failure to test and inspect claim. Plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment, 18. Thus, the Glenns expressly argue that the Motion For Summary Judgment does not encompass all their claims.

B&R does not respond in its Reply to the Glenns' contention that the Motion For Summary Judgment does not encompass all the Glenns' claims.

### b.    *Discussion*

The Glenns have pleaded have pleaded claims besides design defect claims and breach of warranty claims.[1] Even so, the Glenns do not argue that all their other claims

---

[1] Specifically, the Glenns' "negligence" products liability claims, as pleaded, are based on allegations that "B&R negligently failed to remove/recall the defective Original Step Stool from Defendants' distributors" and that "B&R negligently designed, tested, manufactured, inspected, marketed, distributed, and/or promoted the Original Step Stool and its component parts, and failed to exercise reasonable care in designing, testing, manufacturing, inspecting, marketing, distributing, and/or promoting the Original Step Stool and its component part," Complaint, ¶¶ 16-17. Their "strict liability" products

would survive summary judgment, even if their design defect and warranty claims do not. Rather, they identify the surviving claims as "fail[ure] . . . to provide adequate warnings," and "fail[ure] . . . to properly test and inspect [B&R's] older model stools." Plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment, 18. The Glenns do not assert that claims based on a manufacturing defect or failure to properly market, distribute, promote, and/or recall the stepstool would survive summary judgment. B&R expressly pointed out in its Statement of Undisputed Facts, ¶ 13, that the Glenns' expert, Dr. Stephens, does not opine that there is a manufacturing defect in the stepstool, and the Glenns did not assert otherwise in their Statement of Disputed Facts or elsewhere in their Opposition.

I conclude that the Glenns have now abandoned their manufacturing defect claims by failing to challenge B&R's undisputed statement that Dr. Stephens does not assert a manufacturing defect. They have also abandoned their manufacturing defect claims, as well as their claims that B&R failed to properly market, distribute, promote, and/or recall the stepstool, because they have not argued that B&R's Motion For Summary Judgment overlooks those claims. They have also abandoned these other claims by arguing that the only claims that would survive summary judgment on design defect and warranty claims

_____

liability claim also alleges that the stepstool "designed, tested, manufactured, inspected, marketed, distributed and/or promoted by Defendant B&R . . . was defective," Complaint, Fourth Cause of Action, ¶ 38, although the non-exclusive allegations of specific defects are based only on defects in manufacturing, design, and warnings. Id. at ¶ 38(a)-(c) (quoted, supra, page 8).

are "fail[ure] . . . to provide adequate warnings," and "fail[ure] . . . to properly test and inspect its older model stools."[2]

The next question is whether B&R's arguments encompass all of the claims that the Glenns survive, even if B&R's Motion For Summary Judgment is granted. B&R argues that it is entitled to summary judgment for "three primary reasons": (1) the Glenns "have failed to establish a prima facie case of products liability based on circumstantial evidence because they have not proved the absence of evidence of abnormal use and reasonable secondary causes"; (2) the Glenns' "evidence is largely inadmissible, irrelevant, and insufficient to support their claims"; and (3) "with regard to [the Glenns'] warranty claims, [the Glenns] are not in contractual privity with [B&R] and do not assert third party beneficiary status." The bulk of B&R's arguments appear to address the Glenns' design defect claim, with relatively limited arguments concerning the warranty claims. Unfortunately, B&R did not expressly argue in its opening brief precisely why the flaws it identifies in the Glenns' case would necessarily defeat the Glenns' other products liability claims, specifically, their failure to warn claim and failure to test and inspect claim.

---

[2] I recognize that the Glenns' primary contention that they are entitled to amend their Complaint to seek punitive damages is that, despite B&R's knowledge of the defects in the stepstool, B&R chose not to recall it or even consider doing so, which demonstrates the required deviation from standards of reasonable conduct. *See, e.g.,* Plaintiffs' Memorandum In Support Of Plaintiffs' Motion For Leave To Amend Complaint To Include A Claim For Punitive Damages, 2. Nevertheless, the Glenns have not argued in opposition to summary judgment that B&R's liability for Mrs. Glenn's injuries in this case can be premised solely on B&R's failure to recall the stepstool. Thus, to the extent that the Glenns may have intended failure to recall the stepstool as a separate basis for liability, I find that they have abandoned such a claim.

The first ground B&R asserts for summary judgment on the Glenns' "products liability" claims are that the Glenns have failed to prove (or generate genuine issues of material fact on) the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes. The seminal case on the "absence of abnormal use" and the "absence of evidence of reasonable secondary causes" requirements in products liability cases is *Farmer v. International Harvester Company*, 97 Idaho 742, 553 P.2d 1311 (1976). *Farmer* cast the absence of abnormal use and the absence of reasonable secondary causes as requirements to prove a products liability case based on a product "defect" (or "malfunction"),[3] without specification of the nature of the "defect" as a design defect, manufacturing defect, or other defect. 97 Idaho at 747, 553 P.2d at 1311 ("A prima facie case may be proved by direct or circumstantial evidence of a malfunction of the product and the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant.").

There are, however, "three general categories of strict liability a [products liability] case falls under—manufacturing defect, design defect, or failure to warn." *Mortensen v. Chevron Chem. Co.*, 107 Idaho 836, 839, 693 P.2d 1038, 1041 (1984). It is clear that, in design defect and manufacturing defect products liability cases under Idaho law, the claimant must prove the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes. *See, e.g., Liberty Nw. Ins. Co. v.*

---

[3] In *Farmer*, the court explained,

> A distinction need not be drawn between a 'defect' and a 'malfunction'. Proof of malfunction is circumstantial evidence of a defect in a product since a product will not ordinarily malfunction within the reasonable contemplation of a consumer in the absence of a defect."

*Farmer*, 97 Idaho at 748, 553 P.2d at 1312.

*Spudnik Equip. Co., L.L.C.*, 155 Idaho 730, 733, 316 P.3d 646, 649 (2013) (explaining, in a case involving negligent design and manufacturing, "Where, as here, the prima facie case is met with evidence that the product has been modified since leaving the control of the manufacturer, the plaintiff must show the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant." (internal quotation marks and citation omitted)). Case law reveals that the same requirements apply in products liability cases under Idaho law based on defective inspection. *See, e.g., Corbridge v. Clark Equip. Co.*, 112 Idaho 85, 87, 730 P.2d 1005, 1007 (1986) (discussing claims of "defective design, manufacture, and inspection," and stating, "To prove a prima facie case, a plaintiff must not only show that the product was defective and unreasonably dangerous, but there must be a lack of evidence of abnormal use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant." (citing *Farmer*, 97 Idaho at 747, 553 P.2d at 1311)). Likewise, case law reveals that these requirements also apply in cases based on defective warnings. *See, e.g., Mortensen*, 107 Idaho at 839-40, 693 P.2d at 1041-42 ("Regardless of which of the three general categories of strict liability a case falls under—manufacturing defect, design defect, or failure to warn—there are certain elements which must be met," then explaining, "Under *Farmer*, '[a] prima facie case may be proved by direct or circumstantial evidence of a malfunction of the product and the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant.'" (quoting *Farmer*, 97 Idaho at 747, 553 P.2d at 1311)). Thus, if the Glenns cannot ultimately prove the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes, that failing would apply

to all their "products liability" claims, including their failure to warn claim and their failure to test and inspect claim, as well as their design defect claim.[4]

Moreover, B&R also seeks summary judgment on the ground that the Glenns' "evidence is largely inadmissible, irrelevant, and insufficient to support their claims." B&R argues, first, that Dr. Stephens does not present admissible or relevant evidence to support any claims for the reasons asserted in its *Daubert* Motion. B&R contends that the Glenns rely on other equally inadmissible evidence, such as other complaints, design changes, and recalls by other manufacturers, to support their claims. Thus, this ground for summary judgment applies to all the Glenns' claims. B&R also separately challenges the Glenns' warranty claims on the basis of lack of privity.

Therefore, I conclude that B&R's motion for summary judgment addresses all the Glenns' claims.

### 2.    *Summary judgment standards*

Before turning to the challenged claims, I must first summarize the standards for summary judgment. As the Ninth Circuit Court of Appeals recently explained,

---

[4] I do not find it necessary to allow the Glenns to file a sur-reply, as the Glenns request, before deciding on the scope of the Motion For Summary Judgment, because the issue was squarely presented in B&R's Motion For Summary Judgment, its resolution is apparent from long-standing Idaho decisions, and the Glenns admittedly recognized the issue, but chose not to address it in their Opposition, instead deferring any discussion to a possible sur-reply, which is not a matter of right and for which there is no provision in the Federal Rules of Civil Procedure, specifically, Rule 56. *See, e.g., Wyatt v. Sundaram*, No. 115CV00895DADSABPC, 2017 WL 4517820, at *3 (E.D. Cal. Oct. 10, 2017); *see also Mendota Ins. Co. v. Snage*, No. CV-16-03375-PHX-JJT, 2018 WL 487836, at *6 (D. Ariz. January 19, 2018) (considering whether a sur-reply was necessary to address arguments only raised for the first time in the opposing party's reply); *Capital One, N.A. v. Las Vegas Dev. Group, L.L.C.*, No. 2:15-cv-01436-JAD-PAL, 2016 WL 3607160, at *2 (D. Nev. June 30, 2016) (considering whether the sur-reply is intended to address newly-decided authority).

> "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018).

The court explained, further,

> Where . . . the party moving for summary judgment is not the party that bears the burden of proof at trial, it may secure summary judgment by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Sierra Med Servs. All.*, 883 F.3d at 1222. On the other hand, the court has explained,

> Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *cf. Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) ("When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting 11–56 Moore's Federal Practice–Civil § 56.13, in turn citing *Edison v. Reliable Life Ins. Co.*, 664 F.2d 1130, 1131 (9th Cir. 1981))).

With these standards in mind, I turn to B&R's grounds for summary judgment on the Glenns' claims.

### 3. The breach of warranty claims

Although B&R's specific challenge to the breach of warranty claims is the last one B&R asserted, I will consider it first, because it presents a discrete issue. B&R contends that the Glenns' breach of warranty claims are not supported by contractual privity between B&R and the Glenns. B&R points out that the Glenns do not allege that they purchased the stepstool directly from B&R, but from a retailer, and they do not allege third-party beneficiary status. The Glenns argue that their breach of warranty claims are valid, because they are subject to the common law of Idaho and the Idaho Products Liability Reform Act (IPLRA), rather than the Uniform Commercial Code (UCC). I conclude that the Glenns are correct.

In *Oats v. Nissan Motor Corp. in USA*, 126 Idaho 162, 879 P.2d 1095 (1994), the Idaho Supreme Court concluded that the plaintiff consumer's claim of breach of warranty in a defective product action, if brought under the UCC, would be barred by the lack of privity. 126 Idaho at 169, 879 P.2d at 1102. On the other hand, the court held as follows:

> [W]e conclude that when a plaintiff brings a non-privity breach of warranty action against a manufacturer or seller to recover for personal injuries allegedly sustained as a result of a defective product, that action is one for strict liability in tort, governed by the provisions of the IPLRA. *Such an action should not be governed by the buyer and seller concepts of the UCC.* "The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales." *Greenman [v. Yuba Power Prods., Inc.]*, 27 Cal.Rptr. [697,] 701, 377 P.2d [897,] 901 [(Cal. 1963)] (citing *Ketterer v. Armour & Co.*, 200 F. 322, 323 (S.D.N.Y.1912); *Klein v. Duchess Sandwich Co.*, 14 Cal.2d 272, 93 P.2d 799, 804

> (1939)).  [I]t follows from our holding that Oats's "breach of
> warranty" claim survives under the IPLRA's statute of
> limitations.

*Oats*, 126 Idaho at 172, 879 P.2d at 1105 (emphasis added).  Thus, the lack of privity is

not fatal to the Glenns' breach of warranty claims against B&R to recover for personal

injuries as a result of the allegedly defective stepstool.[5]

B&R is correct that, in *Corbett v. Remington Arms Co., L.L.C.*, No. 4:15-CV-

00279-BLW, 2016 WL 1755456 (D. Idaho May 2, 2016), the court held that an owner

of a Remington pistol could not pursue his breach of warranty claims against the

manufacturer for personal injuries owing to lack of privity.  The court reached this

conclusion, even though it recognized that the Idaho Supreme Court had concluded in

*Oats* that plaintiffs lacking privity with the manufacturer or seller may pursue their claims

for personal injuries based on breach of warranty under the IPLRA rather than the UCC.

*Corbett*, 2016 WL 1755456, at *2.  The court in *Corbett* did not explain, however, why

the plaintiff could not or had not pursued a claim under the IPLRA, but under the UCC,

such that lack of privity barred the plaintiff's claim.  *Id.*  I find *Oats* rather than *Corbett*

controlling, here.

Therefore, B&R is not entitled to summary judgment on the Glenns' breach of

warranty claims on the basis of lack of privity.

---

[5] In *Oats*, the court explained, "UCC breach of warranty actions for personal injuries are available only to a limited group of potential plaintiffs who are either in privity of contract with the manufacturer or seller, or who qualify as third party beneficiaries of the underlying sales contract, as defined in I.C. § 28–2–318." 126 Idaho at 169, 879 P.2d at 1102.  This was not the holding in *Oats*, however.

#### 4. *Failure to establish* **prima facie** *claims of products liability*

B&R's asserts as a ground for summary judgment on the Glenns' products liability claims that the Glenns' allegedly failed to establish a *prima facie* case of products liability. The Glenns disagree.

#### a. *The elements in dispute*

B&R argues that the Glenns cannot prove two elements of their *prima facie* case: the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes.[6] The Glenns argue that they are required to prove the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes only if their *prima facie* case is proved by circumstantial evidence of a malfunction of the product, but not if it is proved by direct evidence of a malfunction of the product, citing *Mortensen*, 107 Idaho at 839-40, 693 P.2d at 1041-42. They contend that they have both direct and circumstantial evidence. I disagree with the Glenns' initial premise.

In *Mortensen*, the Idaho Supreme Court stated, "Proof of malfunction causing direct injury . . . could, under certain circumstances, be circumstantial evidence of the defect in the product at the time of sale." 107 Idaho at 839, 693 P.2d at 1041 (citing *Farmer*, 97 Idaho 742, 553 P.2d 1306). The court then added, "However, the *Farmer* rule that evidence of malfunction is circumstantial evidence of a 'defective condition' only applies where the plaintiff's proof has excluded the possibility of other 'reasonably likely causes.'" *Id*. (citing *Farmer*, 97 Idaho at 749, 553 P.2d at 1313). Thus, the requirement to exclude other "reasonably likely causes" applies to the question of whether a malfunction is circumstantial evidence of a defective condition. More to the

---

[6] Elsewhere in its summary judgment briefing, B&R argues that the Glenns cannot establish any defect in the stepstool or that any defect was a cause of Mrs. Glenn's injuries. I will address the "defect" and "causation" elements in my discussion, below, of B&R's argument that the Glenns have no admissible evidence to support their claims.

point, however, in *Mortensen*, the court explained, "Under *Farmer*, '[a] prima facie case may be proved by direct or circumstantial evidence of a malfunction of the product and the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant.'" *Id*. at 839-40, 693 P.2d at 1041-42 (emphasis added) (quoting *Farmer*, 97 Idaho at 747, 553 P.2d at 1311). Thus, *Mortensen* and *Farmer* plainly state that the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes are requirements of a *prima facie* case of a product defect, whether the evidence of a malfunction is direct or circumstantial.

Because the Glenns are required to prove both the absence of evidence of abnormal use and the absence of evidence of reasonable secondary causes, I will consider their proof on each element, in turn.

### b.    *Abnormal use*

### i.    *Arguments of the parties*

B&R argues that the Glenns have not addressed at all potential misuse or abnormal use of the stepstool with regard to the four missing feet; at most, B&R argues, they have asserted that the stepstool underwent "normal usage," without accounting for the missing feet. B&R points out that Dr. Stephens concedes, in an opinion now excluded, that he does not know how or when any feet came off, but B&R asserts that, if less than all the feet were off, the stepstool would have been noticeably unbalanced or wobbly. B&R argues that, to the extent the Glenns did not voluntarily modify the stepstool by removing the remaining feet to fix a wobble—which they deny doing—the Glenns must have used the stepstool in a manner that scoured off all four feet at the same time. B&R also argues that two of the four tabs on the Glenns' stepstool were broken sometime before Mrs. Glenn's fall. B&R contends that, although the Glenns suggest that the missing tabs might have been responsible for the fall under some of their theories, they do not show

that the tabs were broken in normal use from normal wear and tear, nor do they eliminate the possibility of abnormal use, let alone show that the missing tabs resulted from a design defect. B&R then argues that the damaged condition of the stepstool was the result of abnormal use. B&R contends that the Glenns cannot show otherwise, because they have admitted the pre-existing damage and Dr. Stephens conceded that the stepstool's material is strong, tough, and durable. B&R also argues that Dr. Stephens's undocumented "extreme" testing was abnormal use.

The Glenns seem to suggest—and B&R understands them to argue—that Mrs. Glenn will testify that the Glenns only used the stepstool in normal ways and did not abuse it. The Glenns expressly reject B&R's contention that the fact that the tabs were broken and the feet were scoured off shows abnormal use, because that argument is contrary to their own contention that defects with the stepstool were that the tabs broke easily, allowing remaining tabs to fall into the wrong cavities and falsely appear properly locked, and that the feet were prone to fall off on their own, wear out, and fail over time, making the stepstool more prone to skidding or sliding. The Glenns argue that B&R's contention that the stepstool must have been noticeably wobbly if less than all the feet had come off is absurd, because the feet were very thin—indeed, mere fractions of an inch—and compressed when weight was applied. The Glenns also contend that evidence of other complaints that the feet fell off, that the tabs broke, and that the remaining tabs would fall into the wrong cavities, all in normal use, and observations of those defects with the stepstool in normal usage by B&R employees including Mr. Kulzer, who ran B&R's plant, also support their claims that there was no abnormal use of their stepstool. Thus, the Glenns contend that there is a genuine issue of material fact as to whether they put the stepstool only to proper and ordinary use.

In reply, B&R argues that the Glenns' contention that there are genuine issues of material fact as to abnormal use is an admission that there is evidence of abnormal use,

but the Glenns must show that there is a complete absence of evidence of abnormal usage. B&R also argues that the Glenns' contentions that an average user might not be aware that the stool was locking into an improper position implies that normal usage involves ignoring warnings and instructions. B&R also contends that the Glenns' argument is disingenuous in light of Mrs. Glenn's clear awareness and understanding of the proper usage of the stool and inconsistent with the standards for summary judgment, which require admissible specific record evidence.

### ii.    *Discussion*

Decisions of Idaho courts are remarkably unhelpful on what might constitute absence of evidence of abnormal use. Federal courts applying Idaho law are only slightly more helpful. For example, in an unpublished decision, the Ninth Circuit Court of Appeals concluded that "the government's use of Oust in accordance with its label, and with DuPont's active advice and participation, was not abnormal use." *Adams v. United States*, 449 F. App'x 653, 657 (9th Cir. 2011). On a motion for summary judgment, however, I conclude that the question is whether, on the evidence in the record, a reasonable jury could find that the Glenns have shown the absence of abnormal use. *See Sierra Med. Servs. All.*, 883 F.3d at 1222. I also conclude that B&R reads *Mortensen*, 107 Idaho at 840, 693 P.2d at 142, too broadly, when it argues that it stands for the proposition that that the plaintiff must show the complete absence of evidence of abnormal use to survive summary judgment.

First, *Mortensen* considered post-trial challenges to the verdict, not a pre-trial summary judgment standard. 107 Idaho at 840, 693 P.2d at 1042 (holding that the trial court erred in failing to grant the manufacturer's motion for judgment n.o.v.). Just as B&R argues that there is no special exception from summary judgment for products liability cases, there is no special exception from the "reasonable jury" standard for summary judgment in such cases. Second, the focus of the court's analysis in the

pertinent part of *Mortensen* was on the absence of evidence of reasonable secondary causes, not the absence of evidence of abnormal use. *Id*. Even so, the court considered only reasonable secondary causes for which there was evidence in the record, not mere speculation. *Id*.

Here, the Glenns certainly have not yet proved that there is no way the malfunction of the stepstool occurred in the absence of any abnormal use of the stepstool, either prior to or at the time of Mrs. Glenn's accident. Nevertheless, I find that a reasonable jury could find that there was no abnormal use of the stepstool, either prior to or at the time of the accident, in light of the record evidence. *Sierra Med. Servs. All.*, 883 F.3d at 1222. That record evidence includes the following: Mrs. Glenn's testimony about how she ordinarily used the stepstool, how she used it the day of the accident, and did so in accordance with the instructions and warnings on the stepstool, *cf. Adams*, 449 F. App'x at 657; evidence that the Glenns never used the stepstool in abnormal ways; evidence that the Glenns were not aware of any missing tabs or missing feet at the time of the accident; other evidence that tabs were broken and feet fell off in ordinary use of the stepstool, including evidence that employees of B&R, including Mr. Kulzer, had noticed that fact; and evidence that missing tabs and missing feet may not be immediately apparent in normal use of the stepstool.

Thus, B&R is not entitled to summary judgment on the products liability claims on the ground that the Glenns cannot prove the absence of abnormal use of the stepstool.

### c. *Reasonable secondary causes*

#### i. *Arguments of the parties*

B&R argues that the Glenns have also failed to demonstrate the absence of evidence of reasonable secondary causes. B&R contends that the Glenns have not addressed the multiple possible reasonable alternative causes for Mrs. Glenn's fall. B&R argues that these reasonable alternative causes include Mrs. Glenn's complex medical

history; the combined effects of her prescribed medication; and/or the likelihood that Mrs. Glenn's fall was simply an accident, where people, and especially senior citizens, fall in everyday life. As to the first two points, B&R relies on Dr. Kristensen's opinions to show that there are reasonable secondary causes in Mrs. Glenn's medical history and the medications she was using. As to the third point, B&R points out that, as people age, the risk of injury from falling increases dramatically. B&R relies on *Murray v. Farmers Ins. Co.*, 118 Idaho 224, 796 P.2d 101 (1990), as supporting its position. B&R argues that, in *Murray*, the plaintiffs introduced evidence of the new condition of their vehicle and testimony of a single expert, who had been retained to survey only the type of damage that the vehicle had sustained, but not to conduct an accident reconstruction, that a possible broken tie rod was the cause of the accident, but the court found such evidence insufficient to negate other causes. B&R then reiterates that the burden is on the Glenns to eliminate all reasonable alternative explanations for Mrs. Glenn's fall.

The Glenns counter that there is simply no other reasonably likely cause of Mrs. Glenn's fall. Rather, they contend that Dr. Kristensen's opinions are simply speculative and contrary to the evidence, from Mrs. Glenn and her treating physician, who will both testify that Mrs. Glenn did not suffer any dizziness or fainting the day of her accident and that she does not recall ever being diagnosed with a seizure disorder. The Glenns contend that, if nothing else, the disagreement between the medical experts generates a genuine issue of material fact on reasonable secondary causes. The Glenns argue that B&R's theory that Mrs. Glenn simply fell, because she is old, is even more speculative and unsupported by any actual evidence. They point out that their record evidence shows that Mrs. Glenn was in good health and active prior to the accident and that her last fall had been fifteen years earlier.

In reply, B&R reiterates that it is not enough for the Glenns to show that the cause they rely on is more likely responsible for Mrs. Glenn's accident than other causes.

Rather, B&R argues, the Glenns must show that there is no evidence of other reasonable causes, so that if there is evidence in the record that would support the inference of a secondary cause, or only generate genuine issues of material fact as to the cause, the Glenns lose. B&R argues that the Glenns cannot demonstrate the unreasonableness of B&R's secondary causes—dizziness or fainting from recent diarrhea or medications and the possibility that Mrs. Glenn fell simply because she is elderly—because B&R points to reports and records from the United States Centers for Disease Control (CDC) including statics showing that falling is a commonly known and leading cause of injury and death among Americans over 65.[7] B&R argues that the Glenns' case is ultimately a tautology: The stepstool was defective (or malfunctioned) because Mrs. Glenn fell, and she fell because the stepstool was defective (or malfunctioned).

## ii. Discussion

The Idaho courts have provided rather more guidance on this requirement of a *prima facie* case of products liability than they have on the "abnormal use" requirement.

---

[7] In a June 22, 2018, Request For Judicial Notice, B&R asks me to take judicial notice of these reports and statistcs from the CDC. I conclude that it is proper to take judicial notice of information from a federal agency, such as the CDC, under Rule 201 of the Federal Rules of Civil Procedure, as facts from a governmental agency that are not subject to reasonable dispute. *See, e.g., United States v. Chester*, 628 F.3d 673, 692 & n.4 (4th Cir. 2010) (taking judicial notice of records of the CDC); *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of records on the CDC's website); *see generally Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) ("The contents of an administrative agency's publicly available files . . . traditionally qualify for judicial notice. . . ."); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of materials on the websites of two federal agencies). B&R's Request For Judicial Notice also asks me to take judicial notice of Newton's Third Law of Motion, as a matter that can be accurately and readily determined from encyclopedias, treatises, and scientific sources. I agree. Thus, B&R's Request For Judicial Notice is granted.

For example, in *Farmer*, the court explained, "A plaintiff need not exclude every possible cause but only reasonably likely causes." 97 Idaho at 749, 553 P.2d at 1313. In *Farmer*, there was no dispute that the steering in a truck malfunctioned in some way during the course of normal operation, even though there were disputes about what components caused that steering malfunction. The court concluded there was an absence of evidence of reasonable secondary causes, because there was no argument that anything other than the steering malfunctioned. *Id.* at 750-51, 553 P.2d at 1314-15. Thus, while *Farmer* teaches that the Glenns are not required to exclude every possible cause, only reasonably likely ones, unlike the situation in *Farmer*, the Glenns and B&R dispute whether the stepstool malfunctioned in any respect.

In *Murray*, another products liability case involving a vehicle accident, on which B&R relies, the court reached the opposite result, finding there was evidence of reasonable secondary causes, so the plaintiffs had failed to establish their *prima facie* case. 118 Idaho at 226, 796 P.2d at 103. The court addressed the "reasonable secondary causes" issue, as follows:

> In the present case, Paul Murray's testimony concerning the circumstances of the accident and other evidence is not sufficient to negate other possible causes of the accident. There are two facts in the record which would tend to establish a defect. First, the fact that the car was new, with less than 8000 miles on the odometer at the time of the accident. The second is the statement by an investigator retained by Vasseur, Mel Stewart. Stewart, who was not an accident reconstruction or mechanical expert, was retained to survey the type of damage sustained by the vehicle. In the course of a short description of the external damage, Stewart noted that the front wheels were at an odd angle, "indicating the possibility of a broken tie rod."
>
> On the other hand, there is ample evidence in the record which would support the inference that the accident

was not due to a defect in the automobile. The accident occurred late at night on the downgrade of a winding, unlit road. Further, Murray testified that he had consumed one or two beers prior to the accident. The police report stated that Murray had said he was unfamiliar with the front wheel drive of the car, which was primarily used by his wife. Murray told the investigating officer, as reflected in the police report, that he felt a loss of traction, as compared to his testimony on the record that he lost control of the steering. The police report listed "driver action" as a contributing circumstance to the accident. Murray's own testimony shows that he believed that he had hit ice.

*Murray*, 118 Idaho at 229, 796 P.2d at 106. In light of this record, the court concluded that the Murrays had not met their burden to prove the existence of a defect in the automobile, rather than some other reasonable secondary cause of the accident. *Id*.

In both *Farmer* and *Murray*, in deciding whether there was evidence of reasonable secondary causes, the court looked at *record evidence about the allegedly defective product and the circumstances in which the accidents occurred*, not simply speculation from general characteristics of the products or the injured persons, in making a determination of whether or not there was evidence or the absence of evidence of reasonable secondary causes. In *Farmer*, those facts were the malfunction of the steering and the lack of any contention or evidence that there was some other cause of the accident. 97 Idaho at 750-51, 553 P.2d at 1314-15. In *Murray*, those facts were the time (night) and place (on a downgrade) of the accident; the road conditions (winding and unlit); the driver's possible impairment, where he admitted to drinking one or two beers prior to the accident; the driver's unfamiliarity with a front-wheel drive vehicle; the driver's report to the investigating officer that he felt a loss of traction and lost control; and the driver's own testimony that he believed he had hit ice. 118 Idaho at 229, 796 P.2d at

106. In *Murray*, the only evidence on the other side of the question was the expert's *speculation* that a broken tie rod *possibly* caused the accident. *Id.*

In this case, B&R's expert, Dr. Kristensen, speculates from *general* information about Mrs. Glenn's health history, age, and medications, that she *possibly* was at risk of dizziness or fainting or a seizure at the time of the accident, but the Glenns have pointed out that there is no evidence that Mrs. Glenn was dizzy, fainted, or had a seizure at the time of the accident. The Glenns are not required to exclude "every possible cause but only reasonably likely causes." *Farmer*, 97 Idaho at 749, 553 P.2d at 1313. Dr. Kristensen's possible cause, based only on speculation, is not a "reasonably likely cause." At an even greater degree of generality is B&R's reliance on statistics from the CDC showing that falling is a commonly known and leading cause of injury and death among Americans over 65. Those statistics, however, rely on only a single factor, Mrs. Glenn's age, without considering any of her other personal characteristics or the circumstances of the accident. At best, Mrs. Glenn falling because of her age is a "possible cause," but the CDC statistics do not establish that, as to Mrs. Glenn or any other specific person over 65 in any specific circumstances, falling is a "reasonably likely cause."

Although I have not yet addressed whether the Glenns can prove that a defect in the stepstool was a cause of Mrs. Glenn's accident—a matter I will take up in the next section—I conclude that B&R is not entitled to summary judgment on the products liability claims on the ground that the Glenns cannot show that there is no evidence of any reasonable secondary causes.

### 5.    *Insufficient evidence*

B&R's remaining ground for summary judgment is that the Glenns' "evidence is largely inadmissible, irrelevant, and insufficient to support their claims." The Glenns also resist summary judgment on this ground.

*a.* ***Arguments of the parties***

B&R argues that Dr. Stephens's opinions do not preclude summary judgment, for the reasons set out in more detail in B&R's *Daubert* Motion—and I did exclude Dr. Stephens's testimony, above. B&R argues that, even if they were admissible, Dr. Stephens's theories about shifting, tipping, and sliding are inadequate and, indeed, are different from their pleaded claim that the stepstool "collapsed." B&R argues that the Glenns' sole physical evidence is that the tabs on the stepstool were broken and the feet were missing, but both conditions occurred long before the accident, so B&R argues that physical evidence actually disproves the Glenns' defect allegations. B&R argues that the Glenns resort to evidence of subsequent design improvements, which is inadmissible under IDAHO CODE § 6-1406; evidence of other incidents and complaints, which is inadmissible hearsay and inadmissible under Rules 402 and 403 of the Federal Rules of Evidence; and evidence of other manufacturers' recalls of similar products, which is also inadmissible under Rules 402 and 403.

In contrast, the Glenns argue that the stepstool is direct evidence of a product defect, because the jury will be able to see that two tabs were broken, that the remaining tabs can fall into the wrong cavity preventing the stepstool from locking properly, and that the feet are missing, so that the stepstool would slide more easily. They point out that the effect of these flaws is confirmed not just by Dr. Stephens's opinions but by the testimony of Mr. Kulzer, who ran B&R's facility. Putting all this together, the Glenns argue, the jury will be able to see that the stepstool is defective in that its integrity is compromised when it does not lock properly, because tabs have broken off, and slides more easily, because feet are missing, and that tabs may break and feet may go missing in normal use.

The Glenns argue that their circumstantial evidence includes Mrs. Glenn's testimony that the stepstool malfunctioned, Dr. Stephens's opinions, customer complaints

and lawsuits about broken tabs and missing feet, and B&R's modifications to make the stepstool safer after its own employees, including Mr. Kulzer, observed that tabs could break and feet could go missing in normal use. They argue that Dr. Stephens's testimony is admissible for the reasons stated in their opposition to B&R's *Daubert* Motion, but I have rejected their arguments that Dr. Stephens's testimony is admissible. They also argue that the evidence of complaints, lawsuits, and recalls of similar stepstools by other manufacturers is relevant and admissible, because it is not hearsay where such evidence is not being offered for the truth of the statements in them, but to show that B&R had knowledge that its customers were reporting that tabs were breaking and that feet were falling off in normal use, leading to potential injuries. Moreover, the Glenns argue, B&R modified the design of its stool several times to make it safer, which involved using thicker, more generous tabs and better feet. They contend this evidence is admissible, because it also speaks to the timing and severity of B&R's conduct and impeaches B&R's statement that it had no knowledge that its older model stools were defective.

In reply, B&R argues that the Glenns have not generated genuine issues of material fact that the stepstool was defective. B&R contends that there is no evidence that the stepstool collapsed or disintegrated suddenly under Mrs. Glenn, which was the Glenns' originally pleaded claim that the stepstool was defective. B&R also argues that the undisputed facts do not support a slip or tip theory. The majority of B&R's reply consists of renewed challenges to Dr. Stephens's testimony, which I have now excluded. B&R argues that the Glenns rely on disjunctive and inconsistent theories, none of which are supported by evidence in the record.

### b.   Discussion

This ground for summary judgment relates to all the Glenns' claims, not just to the Glenns' design defect claims. As the Idaho Supreme Court has explained,

Regardless of whether a products liability case "is based on warranty, negligence or strict products liability, plaintiff has the burden of alleging and proving that 1) he was injured by the product; 2) the injury was the result of a defective or unsafe product; and 3) the defect existed when the product left the control of the manufacturer."

*Massey v. Conagra Foods, Inc.*, 156 Idaho 476, 482, 328 P.3d 456, 462 (2014) (quoting *Farmer*, 97 Idaho at 746–47, 553 P.2d at 1310–11); *Liberty Northwest Ins. Co. v. Spudnik Equip. Co., L.L.C.*, 155 Idaho 730, 733, 316 P.3d 646, 649 (2013) (identifying these as the elements of a *prima facie* case of a products liability claim based on negligent design or negligent manufacture). A failure to warn claim is also a products liability claim, *Massey*, 156 Idaho at 484, 326 P.3d at 464, specifically, one in which "a 'product is defective if the defendant has reason to anticipate that danger may result from a particular use of his product and fails to give adequate warnings of such danger.'" *Liberty Northwest Ins. Co.*, 155 Idaho at 734, 316 P.3d at 650 (quoting *Puckett v. Oakfabco, Inc.*, 132 Idaho 816, 823, 979 P.2d 1174, 1181 (1999)). Idaho cases also make clear that failure to inspect, resulting in the defendant's failure to discover a product defect, is an independent basis for products liability. *See, e.g., International Harvester Co. v. TRW, Inc.*, 107 Idaho 1123, 1128, 695 P.2d 1262, 1267 (1985) (citing *Farmer*, 97 Idaho at 751, 553 P.2d at 1315). Thus, in each of the claims that the Glenns assert, a product defect and injury caused by that defect must be proved.

Even though I must take the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the Glenns and decide if the evidence is such that a reasonable jury could return a verdict for the Glenns, *see Sierra Med. Servs. All.*, 883 F.3d at 1222, I conclude that summary judgment for B&R is appropriate in this case. This is so, because even if there is a jury question on whether the product was defective,

the Glenns have presented no evidence from which a reasonable jury could find that the alleged defects caused Mrs. Glenn's injury.

As to proof of a defect, in either design, or warning, or failure to inspect for a defect that rendered the stepstool unreasonably dangerous, the Glenns have shown that there is evidence that two of the four tabs on the stepstool were broken and that the feet were missing at the time of the accident. Although the tabs were not broken and the feet were not missing at the time that the stepstool left B&R, the manufacturer, *see Massey*, 156 Idaho at 482, 328 P.3d at 462 (last element), the Glenns have pointed to evidence, including evidence from Mr. Kulzer, that the weakness of the tabs as designed made them prone to breakage in normal use and that the design of the feet made them prone to come off in normal use, which were defects that existed when the stepstool left B&R's control. Erring on the side of caution to draw all reasonable inferences in the light most favorable to the Glenns, I conclude that a jury would be able to see that the stepstool is defective in that its integrity is compromised when it does not lock properly, if tabs have broken off, and slides more easily, if feet are missing.

The problem for the Glenns is that they have not pointed to any admissible evidence that the alleged defect caused Mrs. Glenn's injury. Although they assert that Mrs. Glenn testified that the stepstool malfunctioned, her testimony is that she does not recall any indication that the stepstool was about to fail, or that it slipped or tipped or became unstable, and, in fact, she does not recall anything between reaching up for the bowl on the shelf and finding herself on the floor. Thus, her testimony shows only the occurrence of an accident, and the Idaho Supreme Court has made clear, "the plaintiff will not carry his burden of proof [on a products liability claim] by merely proving the fact of the occurrence of an accident." *Farmer*, 97 Idaho at 749, 553 P.2d at 1313; *see also Murray*, 119 Idaho at 228, 796 P.2d at 105 (quoting *Farmer*). The Glenns also offered Dr. Stephens's opinions about how the alleged defects caused Mrs. Glenn to fall,

but I have excluded Dr. Stephens's opinions. Their other evidence of causation is equally problematic.

As to "other incidents and complaints" evidence to show defects and causation, B&R argues that such evidence lacks foundation and substantial similarity and is hearsay. As to B&R's hearsay objection, the Glenns argue, in one breath, that evidence of "other incidents and complaints" demonstrates both defect and causation, but in the next breath, argue that such evidence is not hearsay, because it is offered to show that B&R had notice that tabs could break off and that feet could come off the stepstool in the course of normal use, not for an impermissible purpose, such as the truth of the claims in the "other incidents and complaints" evidence. It is only the truth of the claims in this "other incidents and complaints" evidence, however, that would establish a defect in the stepstool or that any defect caused injuries.

In their resistance to summary judgment, the Glenns expressly address only B&R's hearsay objection to the "other incidents and complaints" evidence, *see* Plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment at 9, but in footnote 3, they refer me to their Reply Memorandum in support of their Motion To Amend for further argument about the admissibility of this evidence. In the cited Reply, the Glenns assert that this evidence is relevant to the presence of defects (albeit sometimes identified as manufacturing defects, which I found, above, was a claim that the Glenns have abandoned), causation, and notice to B&R, and that "any potential prejudice from lawsuits or complaints that [are] not 'substantially similar' to [the Glenns'] is significantly outweighed by their probative value." They add that at least some of the "other incidents and complaints" arise from substantially similar circumstances, because those incidents and complaints alleged broken tabs, missing feet, and people falling off stools and injuring themselves. The Glenns do not specifically identify *any* "other incidents and complaints" evidence as involving "substantially similar" circumstances, however.

Under Idaho law, "Evidence of other accidents may be admissible to prove the existence of a particular physical condition or defect, the risk created by a defendant's conduct, that the defect caused the alleged injury, or that a defendant had notice of the danger." *Fish Breeders of Idaho, Inc. v. Rangen, Inc.*, 108 Idaho 379, 382, 700 P.2d 1, 4 (1985) (citing McCormick on Evidence, § 200 (3rd Ed. 1984)); *see also Hawks v. EPI Prod. USA, Inc.*, 129 Idaho 281, 286, 923 P.2d 988, 993 (1996) ("Evidence of other accidents may be admissible to prove that a defendant had notice of the alleged danger"); *Sliman v. Aluminum Co. of Am.*, 112 Idaho 277, 731 P.2d 1267 (1986) (such evidence may also be "relevant to whether or not the defendant had notice of the danger" (citations and internal quotation marks omitted)), *cert. denied*, 486 U.S. 1031 (1988). It may also be admissible on the question of whether punitive damages are warranted. *Id.* "Substantial similarity" is not just a matter going to the weight of the "other incidents and complaints" evidence, however, but a matter going to its admissibility. As the Idaho Supreme Court has explained,

> Evidence of other accidents may be excluded if the trial court decides that: (1) the evidence would unfairly prejudice the opposing party; (2) the other accidents are not substantially similar to the subject case; or (3) the evidence would raise collateral issues or confuse the jurors. [*Sliman*,] 112 Idaho at 284, 731 P.2d at 1274.

*Hawks*, 129 Idaho at 287, 923 P.2d at 994; *Fish Breeders of Idaho, Inc*, 108 Idaho at 382, 700 P.2d at 4 ("Evidence of other accidents may be excluded if the trial court decides that the evidence would unfairly prejudice the opposing party, that the other accidents are not substantially similar to the subject case, or that admission will raise collateral issues or confuse the jurors.").

B&R put at issue the admissibility of the "other incidents and complaints" evidence, in this part of its Motion For Summary Judgment, "by showing—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Sierra Med Servs. All.*, 883 F.3d at 1222 (internal quotation marks and citations omitted), where B&R expressly argued the "other incidents and complaints" evidence lacks "substantial similarity." B&R's Memorandum In Support Of Motion For Summary Judgment at 11. In response, however, the Glenns have not met their burden to identify specific evidence from which a reasonable jury could find in their favor. *Id.* Bald assertions that some of the "other incidents and complaints" evidence *could be* substantially similar, without identifying any incidents and why they are substantially similar, is not enough. This is so, even though the other incidents only need to be "substantially similar" to the one in this case, not identical in every detail. *Sliman*, 112 Idaho at 284, 731 P.2d at 1274; *Fish Breeders of Idaho, Inc.*, 108 Idaho at 382, 700 P.2d at 4. Based on the Glenns' response, neither I nor a reasonable juror could make the kind of detailed assessment of the extent of the similarity between this case and any other incidents that were undertaken, for example, by the trial court in *Sliman*. *Id.* In short, the Glenns have not pointed to any admissible evidence of "other incidents and complaints" to prove a defect or any other element of their claims.

That leaves the Glenns' reliance on evidence of B&R's modifications to make the stepstool safer. B&R argues that this evidence is inadmissible for the purpose of proving a defect or causation pursuant to IDAHO CODE § 6-1406. The Glenns acknowledge that B&R has attacked the admissibility of this evidence, but they argue that it is admissible, because it "speaks towards the timing and severity of [B&R's] conduct, and to impeach [B&R's] statement that it had no knowledge that its older model stools were defective." Plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment at 9. In footnote 4, they refer me, again, to their Reply Memorandum in support of their Motion To Amend for further argument about the admissibility of this evidence. In the cited Reply, they rely on the exception for admissibility of "modification" evidence in

IDAHO CODE § 6-1406(2), but they argue only that the exception would allow "modification" evidence to show B&R's knowledge of a defect, not to show a defect or causation. Plaintiffs' Reply Memorandum In Support Of Plaintiffs' Motion For Leave To Amend at 6.

IDAHO CODE § 6-1406 provides, in pertinent part, as follows:

> (1) Evidence of changes in (a) a product's design, (b) warnings or instructions concerning the product, (c) technological feasibility, (d) "state of the art," or (e) the custom of the product seller's industry or business, occurring after the product was manufactured and delivered to its first purchaser or lessee who was not engaged in the business of either selling such products or using them as component parts of another product to be sold, *is not admissible for the purpose of proving that the product was defective in design or that a warning or instruction should have accompanied the product at the time of manufacture.* The provisions of this section shall not relieve the product seller of any duty to warn of known defects discovered after the product was designed and manufactured.

> (2) If the court finds outside the presence of a jury that the probative value of such evidence substantially outweighs its prejudicial effect and that there is no other proof available, this evidence may be admitted *for other relevant purposes, including but not limited to proving ownership or control, or impeachment.*

IDAHO CODE § 6-1406 (emphasis added). Thus, subsection (1) of the statute expressly bars use of the manufacturer's modifications to prove a "defect" and neither "defect" nor "causation" falls within the scope of the exception in subsection (2).

Because the Glenns have not cited any admissible evidence of a "defect" or "causation," a flaw that goes to all of their claims, B&R is entitled to summary judgment

on all of the Glenns' claims. B&R's Motion For Summary Judgment is **granted** as to all of the Glenns' claims.

### C. *Punitive Damages*

The last motion I will address in this ruling is the first one filed, the Glenns' April 26, 2018, Motion For Leave To Amend Complaint To Include A Claim For Punitive Damages, pursuant to IDAHO CODE § 6-1604. Although this was, perhaps, the most hotly contested of the motions now before me, I need not consider it, because the Glenns' claims do not survive summary judgment. *See, e.g., Cedillo v. Farmers Ins. Co.*, 163 Idaho 131, ___, 408 P.3d 886, 892 (2017).

### III. *CONCLUSION*

The question of whether or not to exclude Dr. Stephens's testimony is a close one, and the impact of exclusion of his testimony on the disposition of B&R's Motion For Summary Judgment is profound. Nevertheless, I conclude that Dr. Stephens's testimony should be excluded and that the Motion For Summary Judgment should be granted.

THEREFORE, upon the foregoing,

1.     The Glenns' April 26, 2018, Motion For Leave To Amend Complaint To Include A Claim For Punitive Damages (docket no. 25) is **denied** as moot;

2.     B&R's May 21, 2018, Motion For Summary Judgment (docket no. 28) is **granted** as to all of the Glenns' claims;

3.     B&R's May 25, 2018, *Daubert* Motion In Limine To Exclude Engineer Stephens (docket no. 29) is **granted**; and

4.     B&R's June 22, 2018, Request For Judicial Notice (docket no. 39) is **granted**.

Because summary judgment in favor of B&R has been granted as to all of the Glenns' claims, the trial in this matter is **cancelled**, and **judgment shall enter accordingly.**

**IT IS SO ORDERED**.

**DATED** this 17th day of July, 2018.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA
VISITING JUDGE